IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| EARLE M. CHILES, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 130384N |
| | ) | |
| v. | ) | |
| | ) | |
| MULTNOMAH COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **FINAL DECISION** |

On May 30, 2014, the court entered its Decision in the above-entitled matter. Defendant filed a Statement for Costs and Disbursements on June 13, 2014, which is within 14 days after the court's Decision was entered, as required under Tax Court Rule-Magistrate Division (TCR-MD) 19 C(1). Plaintiff filed his Objection to Claim by Defendant for Court Costs (Objection) on June 23, 2014. As of the date of this Final Decision, the court has not received a request to schedule a hearing or a request by Defendant to file a reply to Plaintiff's Objection.[1,2] *Cf.* TCR-MD 19 C(2)(b), C(3). This matter is now ready for the court's Final Decision. The court's Final Decision incorporates its Decision and includes the court's analysis and determination of Defendant's request for costs in section III.

Plaintiff appeals the real market value of properties identified as Accounts R165942 and R165943 for the 2010-11 through 2012-13 tax years. The parties filed a signed Stipulation on March 21, 2014, agreeing to the real market value of property identified as Account R165943for the 2010-11 through 2012-13 tax years.

---

[1] In his Objection, Plaintiff wrote, "In the event that the Magistrate considers an award of all or part of the costs claimed by * * * Defendant I hereby request a hearing on the validity of * * * Defendant's claim as well as the amount being claimed." (Ptf's Obj at 2.) Because the court concludes that Defendant's request for costs and disbursements should be denied, the court need not schedule a hearing on the "validity" of Defendant's costs.

[2] Defendant filed a letter responding to Plaintiff's Objection on July 1, 2014, without leave from the court as required by TCR-MD 19 C(2)(b).

A trial was held in the Oregon Tax Courtroom on April 9, 2014, in Salem, Oregon, to consider Plaintiff's appeal of property identified as Account R165942 (subject property) for the 2011-12 and 2012-13 tax years. Prior to the beginning of trial, the court verbally dismissed Plaintiff's appeal of the subject property for the 2010-11 tax year because Plaintiff's requested real market value of $1,650,000 did not meet the requirements of ORS 305.288(1).[3]

Steve Anderson, licensed real estate broker, appeared on behalf of Plaintiff. Daniel Comfort (Comfort), Oregon certified residential appraiser, testified on behalf of Plaintiff. Jeff Brown, Residential Appeals Lead Appraiser, Multnomah County Assessment & Taxation, appeared on behalf of Defendant. Barry Dayton (Dayton), Property Appraiser 3, testified on behalf of Defendant. Plaintiff's Exhibit 1 was received over Defendant's objection. Plaintiff's Exhibit 3 was received without objection. Defendant objected to the relevance of Plaintiff's Exhibit 2, pertaining to agreements between the parties on the real market values of condominium units not at issue in this appeal. The court excluded Plaintiff's Exhibit 2. Defendant's Exhibit A and Rebuttal Exhibits A, B, D, and L were received without objection. Plaintiff objected to Defendant's Rebuttal Exhibit I, a newspaper article discussing Portland's South Waterfront condominium towers generally without any specific reference to the comparable sales used by Plaintiff's appraiser. The court excluded Defendant's Rebuttal Exhibit I because it did not serve a rebuttal purpose.

I.  STATEMENT OF FACTS

The subject property is a 3,812 square-foot[4] condominium unit located in the Fountain Plaza Condominium project on the 30th floor of the KOIN Tower in Southwest Portland. (Ptf's

---

[3] The court's references to the Oregon Revised Statutes (ORS) are to 2011. Although the 2009 ORS are applicable for the 2011-12 tax year, there is no material difference between the 2009 and 2011 versions of the ORS sections cited in this decision.

[4] Dayton reported that the subject property is 3,814 square feet. (Def's Ex A at 18.)

Ex 3 at 9; Def's Ex A at 6.) Dayton testified that the KOIN Tower is an "iconic" building constructed in the 1980s. (*See* Def's Ex A at 6.) The KOIN Tower was LEED certified as of June 2011. (*Id.*) Comfort and Dayton both testified that the 30th floor is the top floor for residential units in the KOIN Tower, although there are four floors above the 30th floor that include storage. (*See id.*) Comfort and Dayton disagreed whether the subject property is a "penthouse." Comfort testified that, based on Wikipedia and "architectural" definitions, the subject property is not a penthouse because it is not located on the top floor of the building and it lacks the large outdoor space typically associated with penthouses. Dayton testified that the subject property is a penthouse because it is the top residential unit in the building.

The subject property interior includes

"[three] bedrooms including a master, [two and one-half[5]] bathrooms including a master, and typical communal rooms to include a kitchen, living room, two large family rooms on opposing ends of the unit, a wet bar on the west end and a den/wet bar on the east end, a formal dining room, and informal dining nook. All rooms have views to the east and north aside from the bathrooms. Upon entry to the unit there is a foyer with marble tile flooring * * *."

(Ptf's Ex 3 at 9.) The subject property includes a 70 square-foot balcony "that over looks the river and has views of Mt. Hood to the east." (*Id.*) Dayton testified that the subject property has a good layout and "spectacular views" out of all the windows. (*See also* Ptf's Ex 3 at 9 (views to Mt. Hood and the Willamette River).) The subject property's amenities include "24-hour concierge service[,] secure underground parking, and terraces as part of the general common elements or limited common elements." (Def's Ex A at 6.)

Comfort and Dayton both testified that the subject property was built in 1985 using high-quality materials and has been "meticulously maintained" by the property owner. (*See* Def's Ex

---

[5] Comfort reported that the subject property includes "2.1 bathrooms." (Ptf's Ex 3 at 9.) Dayton's report clarified that the subject property includes two full bathrooms and one half bathroom. (Def's Ex A at 18.)

A at 7.) Comfort and Dayton disagreed, however, on the current market appeal of the subject property's materials and finishes. Comfort testified that the style of the interior finishes and materials has a dated look that would limit the marketability of the subject property. (*See* Ptf's Ex 3 at 9.) He testified that the market for condominium units in excess of $1 million is typically looking for a contemporary, urban style. Comfort testified that, based on his prior experience as a contractor, it would cost between $100 and $200 per square-foot, or $400,000 to $800,000 total, to bring the subject property up to contemporary standards. Dayton testified that the subject property's interior features are still "market acceptable" due to their high quality and excellent maintenance. (*See* Def's Ex A at 7.)

A.      *Appraisal reports*

Both Comfort and Dayton provided appraisal reports for the subject property for the 2011-12 and 2012-13 tax years. (*See generally* Ptf's Ex 3, Def's Ex A.) Both appraisers used only the sales comparison approach to determine a value for the subject property, finding the cost and income approaches to be inapplicable. (*See id.*)

Comfort testified that he did not contact buyers or sellers for any of the sales that he used in his sales comparison approach. He testified that he gathered information on his sales by reviewing county records, Regional Multiple Listing Service (RMLS), and Portland Maps. Comfort testified that if RMLS did not note any concessions, then he assumed none existed. He testified that he does not know if any of his sales were "bank sales," but he assumes some of his sales were "distressed sales," such as those in the South Waterfront condominium towers. Dayton testified that the county assessor's staff tries to confirm sales initially, and Dayton made an effort to contact all of the brokers for the sales he used. (Def's Ex A at 18-19.)

/ / /

B.      *Subject property's market area*

Comfort and Dayton both testified that they searched for sales of condominium units in Northwest and Southwest Portland. Comfort testified that he limited his search to units ranging in size from 2,500 to 5,500 square feet, but he did not limit his search based on property age. He testified that he sought to bracket the subject property with respect to size, quality, location, and other differences. Comfort testified that the South Waterfront condominiums were completed between 2007 and 2009 with new units available for purchase for $1.3 million and some units on the 30th floor. He testified that those properties flooded the condominium unit market during a time that it was in decline. Dayton limited his search to "sold properties, excluding Real Estate Owned (REO) that are bank foreclosures and short sales," and units ranging from 2,500 to 4,500 square feet. (Def's Ex A at 8.) He first searched for comparable sales in the subject property's "market area," then expanded the search to within two miles to include the "Pearl District and the South Waterfront area, where similar condominium developments are more abundant[.]" (*Id.* at 8-9.) Dayton selected as comparable sales those units within "competing high-rise condominium projects with similar community and neighborhood amenities." (*Id.* at 9 (emphasis omitted).)

C.      *Adjustments*

Comfort adjusted his sales at $15,000 per full bathroom and $10,000 per half bathroom. (Ptf's Ex 3 at 5.) He did not adjust for bedroom count. (*Id.*) Comfort adjusted for size at $150 per square-foot. (*Id.*) He adjusted $25,000 per unobstructed garage space and $15,000 per "extra obstructed tandem space." (*Id.*) Comfort adjusted the "perceived quality rating at $150,000 per full numerical rating in quality difference and $75,000 for a + or − to follow the number[.]" (*Id.*) He testified that he tried to base his quality ratings on the county's system.

Comfort testified that most comparable condominium units in Portland are newer than the subject property, but he did not make any adjustments for age. (*See id.* at 7-8.) He testified that his "quality of construction" adjustments reflected differences in the age and style of the properties.

Comfort testified that, based on his analysis of market data, the market was in decline from 2010 through 2012 with a significant decline from 2010 to 2011. (*See* Ptf's Ex 3 at 22.) He testified that he, nevertheless, did not make any time adjustments to his sales because they were within six months of the assessment date. Comfort testified that he thinks the market decline was due, in part, to the South Waterfront condominium units coming on the market. Dayton criticized Comfort's failure to make time adjustments, noting that, in the sequence of adjustments, time is one of the first adjustments that should be made.

Dayton made no adjustments for bedroom count, which he considered part of the size adjustment. (Def's Ex A at 12.) He made a "lump sum view adjustment based upon a condominium market data study * * *."[6] (Def's Ex A at 12.) This was applied to "difference[s] in building story levels * * *." (*Id.*) His paired sales analysis for gross living area yielded confusing results, so Dayton gave "weak consideration" to that study and, based on his experience, selected $200 per square-foot for size adjustments. (*Id.*) He found a "strong market reaction [may exist] between projects with and without concierge services * * *." (*Id.*) Based on market condition or time studies, Dayton found a downward trend of 17 percent for 2011 and an upward trend of 11 percent for 2012. (*Id.* at 13-14.)

Comfort disagreed with Dayton's $10,000 per floor adjustment. He testified that the tallest building in the Pearl District of Northwest Portland is 17 floors, so a condominium unit on

---

[6] Although the adjustment is identified as a floor adjustment in his report and calculated based on floor differences, Dayton testified that it is a view adjustment. (*See id*. at 17-19.)

the 17th floor of a building in the Pearl will provide views similar to a unit on the 30th floor of a building in Southwest Portland. Comfort testified, for example, that the subject property is only 40 to 50 feet higher in elevation than a penthouse in the Westerly in the Portland hills. Comfort testified that he made "conservative" floor adjustments of $2,500 per floor. (*See* Ptf's Ex 3 at 5.)

D. *Comparable sales*

1. *2011-12 tax year*

For the 2011-12 tax year, Comfort selected three sales as comparable to the subject property; they are identified as sales 4, 5, and 6. (Ptf's Ex 3 at 7.) Sale 4 was a 3,456 square-foot, 4-year-old unit on 30th floor of the John Ross condominiums that sold for $902,300 in May 2010. (*Id.*) Comfort made downward adjustments for bathrooms and a garage and upward adjustments for size and balconies for an indicated value of $935,700. (*Id.*) Sale 5 was a 2,620 square-foot, 5-year-old unit on the 17th floor of the Eliot Tower condominiums that sold for $1,499,000 in September 2010. (*Id.*) Comfort made downward adjustments for quality and a fireplace and upward adjustments for size and floor location, for an indicated value of $1,557,800. (Ptf's Ex 3 at 7.) Sale 6 was a 4,772 square-foot, 6-year-old unit on the 31st floor of the John Ross condominiums that sold for $1,560,000 in June 2010. (*Id.*) Comfort made downward adjustments for bathrooms, size, garage, a fireplace, and floor location for an adjusted price of $1,351,000. (*Id.*)

Comfort testified that sales 4 and 6 are his best comparable sales for the 2011-12 tax year. He testified that both are large, 30th and 31st floor units in Southwest Portland with great views. (*See id.*) Comfort testified that the $150,000 downward quality adjustment to sale 5 was intended to reflect differences in age, condition, and design. He testified that sale 5 is contemporary and includes a slate fireplace, hardwood floors throughout, superior appliances,

granite countertops, and high-end cabinets. Comfort testified that the subject property includes high quality materials but they are dated; the $150,000 adjustment is meant to reflect the cost to bring the subject property to a contemporary style. Comfort concluded a reconciled real market value of $1,275,000 for the subject property for the 2011-12 tax year. (*Id.*)

Dayton selected three comparable sales for the 2011-12 tax year, identified as sales 1, 2, and 3. (Def's Ex A at 10, 18.) Sale 1 was a 3,662 square-foot penthouse unit built in 2007 and located on the 14th floor of the Westerly that sold for $2,222,000 on December 30, 2010.[7] (*Id.*) Dayton described the Westerly as a LEED certified building with amenities similar to the subject property. (*Id.*) Dayton testified that as a concession, the seller paid the buyer's closing costs. He adjusted downward $28,400 for the seller concession, $39,000 for time, $50,000 for parking, and $50,000 for balconies. (*Id.* at 18.) Dayton adjusted upward $30,400 for size and $160,000 for quality of view for an adjusted price of $2,245,000. (*Id.*)

Dayton's sale 2 was a 3,320 square-foot penthouse unit built in 2001 and located on the 11th floor of the Gregory condominiums that sold for $1,985,000 on August 6, 2010. (Def's Ex A at 10, 18.) Dayton testified that the Gregory condominiums have amenities similar to the subject property, but lack concierge service. He adjusted downward $157,000 for time and upward $190,000 for quality of view, $98,800 for size, and $10,000 for "separate storage," for an adjusted price of $2,127,000. (*Id.*) Sale 3 was a 4,065 square-foot penthouse unit built in 2008 and located on the 14th floor of the Westerly that sold for $2,400,000 on May 10, 2011. (*Id.* at 10, 18.) Dayton adjusted downward $50,200 for size, $50,000 for parking, and $25,000 for a balcony. (*Id.* at 18.) He adjusted upward $125,000 for time and $180,000 for quality of view, for an adjusted price of $2,580,000. (*Id.*) For the 2011-12 tax year, he gave the most weight to

---

[7] In his sales grid, Dayton used "pending dates" for his time adjustments. (Def's Ex A at 18.) He identified recorded sale dates in his narrative descriptions of comparable sales. (*Id.* at 10.)

sale 1 and secondary weight to sales 2 and 3, concluding a real market value of $2,300,000 for the subject property. (*Id.* at 15.)

      2.     *2012-13 tax year*

For the 2012-13 tax year, Comfort selected three sales as comparable to the subject property; they are identified as sales 7, 8, and 9. (Ptf's Ex 3 at 8.) Sale 7 was a 3,521 square-foot, 4-year-old unit on the 3rd floor of the Cambridge condominiums that sold for $1,150,000 in May 2011. (*Id.*) Comfort made downward adjustments for bathrooms, a fireplace, and heating/cooling and upward adjustments for size and floor level for an adjusted price of $1,238,700. (*Id.*) Sale 8 was a 2,799 square-foot, 37-year-old unit located waterfront on the ground floor of Riverpoint condominiums that sold for $820,000 in December 2011. (*Id.*) Comfort made downward adjustments for bathrooms and fireplaces and upward adjustments for quality, size, and floor level for an adjusted price of $1,179,500. (*Id.*) Sale 9 was a 3,039 square-foot, 11-year-old unit on the 7th floor of Avalon Penthouses that sold for $1,400,000 in December 2011. (*Id.*) Comfort made downward adjustments for bathrooms, heating/cooling, a large patio or deck, and fireplaces and upward adjustments for size and floor location for an adjusted sale price of $1,496,000. (*Id.*) Comfort concluded a reconciled real market value of $1,300,000 for the subject property for the 2012-13 tax year. (*Id.*)

When questioned by Defendant, Comfort testified that sale 8 was on leased land and the buyers subsequently purchased the land for $201,852. (*See* Def's Rebuttal Ex A.) Comfort testified that he should have made an adjustment for the leased land purchase. Defendant questioned Comfort about sale 9, for which Avalon Hotel Partners is listed as both the buyer and the seller, suggesting this sale was not arm's-length. (*See* Def's Rebuttal Ex B.)

/ / /

For the 2012-13 tax year, Dayton used the two comparable sales in the Westerly that he relied on for the 2011-12 tax year as well as the sale of a 3,245 square-foot penthouse unit on the 19th floor of the Metropolitan, a LEED certified building, for $1,950,000 on January 20, 2012. (Def's Ex A at 11, 19.) Dayton adjusted sale 2 upward $44,000 for the sale pending date, $120,000 for quality of view, $113,800 for size, and $10,000 for storage units for an adjusted price of $2,238,000. (*Id.* at 19.) Dayton adjusted the 3,662 square-foot penthouse, labeled sale 3, downward $28,400 for the seller concession and $50,000 for parking, but omitted the $50,000 downward balcony adjustment he made for the 2011-12 tax year. (*Id.*; *see also id*. at 18.) He adjusted upward $266,000 for the sale date, $174,000 for quality of view, and $30,400 for size, for an adjusted price of $2,614,000. (*Id.*) Dayton adjusted the 4,065 square-foot penthouse, labeled sale 1, downward $50,200 for size, $50,000 for parking, and $25,000 for a balcony. (*Id.* at 19.) He adjusted upward $183,000 for the sale date and $174,000 for quality of view, for an adjusted price was $2,632,000. (*Id.*) For the 2012-13 tax year, Dayton gave the most weight to sales 1 and 2, and less to sale 3 because of the sale date in 2012, concluding a real market value of $2,500,000 for the subject property. (*Id.* at 15.)

E.      *Tax and assessment roll real market values and requested real market values*

The subject property's real market value was $1,985,460 for the 2010-11 tax year, $1,735,960 for the 2011-12 tax year, and $1,704,760 for the 2012-13 tax year. (Ptf's Compl at 4-6.) At trial, Plaintiff requested a 2010-11 real market value of $1,650,000, a 2011-12 real market value of $1,275,000, and a 2012-13 real market value of $1,300,000. (*See* Ptf's Ex 3 at 5, 7-8.) Defendant requested an increase in the subject property's real market value to $2,500,000 for the 2010-11 and 2012-13 tax years and $2,300,000 for the 2011-12 tax year. (Def's Ex A at 16.)

## II. ANALYSIS

A.     *The court's jurisdiction under ORS 305.288(1)*

Plaintiff's appeal of the subject property for the 2010-11 through 2012-13 tax years was filed pursuant to ORS 305.288(1). Under ORS 305.288(1), the court "shall order a change or correction applicable to a separate assessment of property to the assessment and tax roll for the current tax year or for either of the two tax years immediately preceding the current tax year, or for any or all of those tax years," if several conditions are met. One condition is that Plaintiff's Complaint asserts and it is "determined by the tax court that the difference between the real market value of the property for the tax year and the real market value on the assessment and tax roll for the tax year is equal to or greater than 20 percent." ORS 305.288(1)(b). For the 2010-11 tax year, Plaintiff's requested real market value of $1,650,000 is not equal to or greater than a 20 percent difference from the 2010-11 tax and assessment roll real market value. As a result, the court lacks jurisdiction under ORS 305.288(1) to consider Plaintiff's appeal of the subject property for the 2010-11 tax year and must dismiss Plaintiff's appeal for that tax year.

B.     *Real market value*

The remaining issue before the court is the real market value of the subject property for the 2011-12 and 2012-13 tax years. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor* (*Richardson*), TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citations omitted). Real market value is defined in ORS 308.205(1), which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's length transaction occurring as of the assessment date for the tax year."

/ / /

The assessment date for the 2011-12 tax year was January 1, 2011, and the assessment date for the 2012-13 tax year was January 1, 2012. ORS 308.007; ORS 308.210.

The real market value of property "shall be determined by methods and procedures in accordance with rules adopted by the Department of Revenue * * *[.]" ORS 308.205(2). The three approaches of value that must be considered are: (1) the cost approach, (2) the sales comparison approach, and (3) the income approach. OAR 150-308.205-(A)(2)(a). Although all three approaches must be considered, all three approaches may not be applicable in a given case. *Id.* Here, both parties relied on the sales comparison approach.

The sales comparison approach "may be used to value improved properties, vacant land, or land being considered as though vacant." *Chambers Management Corp v. Lane County Assessor,* TC-MD No 060354D, WL 1068455 at *3 (Apr 3, 2007) (citations omitted). "The court looks for arm's length sale transactions of property similar in size, quality, age and location" to the subject property. *Richardson,* WL 21263620 at *3.

> "In utilizing the sales comparison approach only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions. When nontypical market conditions of sale are involved in a transaction (duress, death, foreclosures, interrelated corporations or persons, etc.) the transaction will not be used in the sales comparison approach unless market-based adjustments can be made for the nontypical market condition."

OAR 150-308.205-(A)(2)(c).

C.    *Burden of proof*

"In all proceedings before * * * a magistrate of the tax court * * * a preponderance of the evidence shall suffice to sustain the burden of proof. The burden shall fall upon the party seeking affirmative relief * * *." ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Rev.*, 4 OTR 302,

312 (1971). "[I]t is not enough for a taxpayer to criticize a county's position. Taxpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.,* 16 OTR 56, 59 (2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

D.    *Plaintiff's appraisal*

Defendant cross-examined Comfort extensively about his appraisal report, exposing numerous errors and omissions that Comfort testified were due to "oversight." To name a few, (1) Comfort failed to define "market value," (2) failed to include his "scope of work," "hypothetical conditions," or "extraordinary assumptions" despite statements to the contrary, (3) provided  inconsistent descriptions of the market as "stable" and, elsewhere in his report, as "declining," (4) and checked both "yes" and "no" next to "CC&Rs." (Ptf's Ex 3 at 4, 6.)

Even more concerning was Comfort's testimony that he did not attempt to confirm any of his sales, relying instead on information available through RMLS, county databases, and online at Portland Maps. As a result, Comfort was unaware of whether the sales he relied upon were voluntary, arm's-length sales. He acknowledged that the South Waterfront condominium sales used in his 2011-12 tax year analysis were likely distressed, but he did not confirm that fact or make any adjustment, as required under OAR 150-308.205-(A)(2)(c). Comfort's 2012-13 tax year sales suffered from similar problems. As revealed during cross-examination, the buyers of Comfort's sale 8 were required to pay an additional $201,852 after the sale to purchase land that had previously been leased. Comfort's sale 9 was a transaction between related parties and,

therefore, likely not arm's-length. Comfort acknowledged that he should have made adjustments to each of those sales, but did not.

Although both parties' appraisers agreed that the market was changing significantly between 2010 and 2012, Comfort did not make any time adjustments to his sales, some of which occurred six or seventh months before the applicable assessment date. Based on the foregoing reasons, the court gives no weight to Comfort's sales comparison approach. Plaintiff presented no other evidence of the subject property's real market value for the 2011-12 or 2012-13 tax years. As a result, the court concludes that Plaintiff failed to carry his burden of proof that the subject property's real market values for the 2011-12 and 2012-13 tax years were at least 20 percent less than the tax and assessment roll real market values for those tax years. Because Plaintiff's appeal of the subject property does not meet the requirements of ORS 305.288(1) for the 2011-12 and 2012-13 tax year, the court has no authority to order a change or correction to the tax and assessment rolls for those tax years. Plaintiff's appeal of the subject property for the 2011-12 and 2012-13 tax years must, therefore, be dismissed.

Defendant requests that the court increase the subject property's real market value for the 2011-12 and 2012-13 tax years, but did not pursue a correction through one of the avenues open to it, such as the error correction or omitted property statutes.[8] In an appeal of the current tax year from a board of property tax appeals order, the court would seek to determine the correct valuation of the property at issue pursuant to its authority under ORS 305.412 even if the plaintiff failed to carry its burden of proof. Here, however, Plaintiff's appeal was filed pursuant to ORS 305.288(1) and the court has determined, based on the evidence presented by Plaintiff,

---

[8] "Certain statutes, such as ORS 305.288 and ORS 306.115, provide limited retrospective relief to taxpayers who believe they have been improperly treated and who have not availed themselves of challenges in the year of assessment or other adverse government action. Likewise, assessors may recover from certain errors made in the assessment process under the 'omitted property' and 'error correction' provisions of ORS 311.205 to 311.234." *Georgia-Pacific Consumer Products LP v. Clatsop County Assessor*, 20 OTR 138, 147 (2010).

that the requirements of ORS 305.288(1) are not satisfied with respect to the subject property. The court, therefore, has no authority to order a change or correction to the subject property's real market values on the tax and assessment rolls for the 2011-12 and 2012-13 tax years.

### III.  COSTS AND DISBURSEMENTS ANALYSIS

The Magistrate Division has discretionary authority under ORS 305.490(2) to award costs and disbursement to the prevailing party. *Wihtol I v. Dept. of Rev.*, 21 OTR 260, 267-68 (2013).  The Magistrate Division has promulgated a rule, TCR-MD 19, that sets forth the procedure for a prevailing party to request costs and disbursements.  As required under TCR-MD 19 C(1), Defendant filed a statement for costs and disbursements on June 13, 2014, requesting that the court award it $5,562.93 for "County officers defense preparation; 129 hours" and $34.40 for "Postage, courier, paper, copies," for total costs of $5,597.33.  (Def's Statement, Ex 1.)  Pursuant to TCR-MD 19 C(2), Plaintiff filed an Objection to Defendant's Statement for Costs and Disbursements on June 23, 2014.

At the outset, the court notes that Defendant may not recover as costs any payments to its employees for trial preparation or expert witness testimony.  Expert witness fees in property tax cases are "expenses," not "costs and disbursements."  *See* ORS 305.490(4)(a) ("fees of experts" are "reasonable expenses" that may be awarded by "the tax court judge" in any proceeding "involving ad valorem property taxation").  The allowance of reasonable expenses under ORS 305.460(4)(a) is "in addition to costs and disbursements[.]"  Defendant may not recover its expert witness fees as "costs and disbursements," and the court therefore limits Defendant's request to $34.40 for "postage, courier, paper, copies."

Under TCR-MD 19 B, "costs and disbursements may be awarded only to the prevailing party." *Wihtol v. Multnomah County Assessor* (*Wihtol*), TC-MD No 120762N, WL 274126 at *2

(Jan 24, 2014). Plaintiff disagrees that Defendant was "the prevailing party," asserting that, with respect to Account R165942, "Plaintiff asked that the [real market value] be lowered * * * Defendant asked that it be raised and the court's decision was to sustain the current value, thus there was no prevailing party in this case * * *." (*See* Ptf's Obj at 1.) Plaintiff further noted that the parties reached a stipulated agreement with respect to the other property at issue in this appeal, Account R165943. (*See id.*)

In *Wihtol*, the court observed that "prevailing party" is not defined for purposes of "costs and disbursements," and looked to the definition of "prevailing party" for purposes of making an award of attorney fees under ORS 20.077(2). *Wihtol*, 2014 WL 274126 at *2. Under ORS 20.077(2), the prevailing party is "the party who receives a favorable judgment or arbitration award on the claim." "Under ORS 20.077, there can be more than one prevailing party in actions that involve multiple claims or counterclaims as in the present matter." *Lemargie v. Johnson*, 212 Or App 451, 454 n 3, 157 P3d 1284 (2007). "[U]nder ORS 20.077, the 'prevailing party' is to be determined on a 'claim-by-claim' basis." *Robert Camel Contracting, Inc. v. Krautscheid*, 205 Or App 498, 504, 134 P3d 1065 (2006). "To determine who is the prevailing party on each claim, a court must weigh 'what was sought by each party against the result obtained.' " *Beggs v. Hart*, 221 Or App 528, 537-38, 191 P3d 747 (2008), quoting *Lawrence v. Peel*, 45 Or App 233, 243, 607 P2d 1386 (1980).

This appeal involved multiple claims for relief. Plaintiff appealed two property tax accounts for three tax years each; thus, this appeal involved six claims for relief. Plaintiff prevailed on three of those claims; namely, the three tax years for which the parties stipulated to a lower real market value for Account R165943. Plaintiff is "the prevailing party" with respect to his appeal of Account R165943 for the 2010-11 through 2012-13 tax years even though

Plaintiff obtained relief through a stipulated agreement.[9] *See Waterbury v. Dept. of Rev.*, 11 OTR 314, 316 (1989) ("[t]he operative factor is success, not at which stage or how that success is achieved"). The court dismissed Plaintiff's appeal of the real market value of Account R165942 for the 2010-11 through 2012-13 tax years; thus, Defendant is the prevailing party with respect to the three claims for relief brought by Plaintiff for Account R165942.

Having determined that Plaintiff prevailed on three claims and Defendant prevailed on three claims, the court must now determine, in its discretion, whether to award costs and disbursements to Defendant for the three claims on which it prevailed. *See Wihtol*, 2014 WL 274126 at *4 ("[t]he award of costs and disbursements is entirely discretionary with the court[]"). In *Wihtol*, this court discussed some considerations that may be relevant to the court's exercise of its discretion to award costs. *Id*. at *5. Those considerations included whether a case involved "multiple claims or issues that were variously won and lost by the parties." *Id*. at *6. For example, in *AutoLend, IAP, Inc. v. Auto Depot, Inc. (AutoLend)*, 170 Or App 135, 143, 11 P3d 693 (2000), the defendant "defeated plaintiff's claims against it and plaintiff prevailed on the defendant's counterclaim for breach of the loan agreement." *Id*. at *5. The trial court, in its discretion, declined to award costs to either party.

The court finds the situation presented here to be similar to *AutoLend*. Although Defendant prevailed on the three claims for Account R165942, Plaintiff prevailed on the three

---

[9] In the parties' Stipulation regarding Account R165943, "[t]he parties agree[d] that no party [was] a 'prevailing party' for the purposes of TCR-MD 19 and agree[d] that no party [would] seek recovery of costs and disbursements under TCR-MD 19 from any other party(ies)." (Stip at 1.) Although the parties' Stipulation controls whether the parties may seek recovery of costs and disbursements following the stipulation, it does not control the court's determination that Plaintiff is the prevailing party with respect to Account R165943; that is a legal question to be determined in accordance with applicable statutes, rules, and case law. *See Selective Services, Inc. v. AAA Liquidating*, 126 Or App 74, 78-79, 867 P2d 545 (1994) (reversing trial court's determination of prevailing party as an "incorrect legal conclusion"); *Benj. Franklin Savings and Loan v. Dept. of Rev.*, 310 OR 651, 670-71, 801 P2d 771 (1990) (reversing the tax court's award of costs and disbursements to the Department of Revenue because the taxpayers, rather than the Department of Revenue, were the prevailing parties).

claims for Account R165943. Under those circumstances, the court concludes that Defendant's requests for costs and disbursements should be denied.

IV. CONCLUSION

After careful consideration, the court concludes that Plaintiff's appeal of the subject property for the 2010-11 tax year must be dismissed because Plaintiff's requested real market value does not meet the requirements of ORS 305.288(1). The court further concludes that Plaintiff's appeal of the subject property for the 2011-12 and 2012-13 tax years must also be dismissed because Plaintiff failed to prove by a preponderance of the evidence that the subject property's real market values for those tax years were at least 20 percent less than the tax and assessment roll real market values for those tax years. The court further concludes that Defendant's request for costs and disbursements should be denied. Now, therefore,

IT IS THE DECISION OF THIS COURT that the real market value of property identified as Account R165943 was, as stipulated for the 2010-11 through 2012-13 tax years:[10]

2010-11 tax year:

Real Market Value
Land:                        $        -0-
Improvements:        $798,000
Total:                      $789,000

2011-12 tax year:

Real Market Value
Land:                        $        -0-
Improvements:        $700,000
Total:                      $700,000

/ / /

/ / /

---

[10] The court has jurisdiction under ORS 305.288(1) to order a reduction in the real market value of property identified as Account R165943 for the 2010-11 through 2011-12 tax years.

<u>2012-13 tax year</u>:

Real Market Value
<table>
<tr><td>Land:</td><td>$     -0-</td></tr>
<tr><td>Improvements:</td><td>$655,000</td></tr>
<tr><td>Total:</td><td>$655,000.</td></tr>
</table>

IT IS FURTHER DECIDED that Plaintiff's appeal of property identified as Account R165942 is dismissed for the 2010-11 tax year because Plaintiff's requested real market value for the 2010-11 tax year does not meet the requirements of ORS 305.288(1).

IT IS FURTHER DECIDED that Plaintiff's appeal of property identified as Account R165942 is dismissed for the 2011-12 and 2012-13 tax years because Plaintiff failed to prove by a preponderance of the evidence that its real market values for those tax years were at least 20 percent less than the tax and assessment roll real market values for those tax years.

IT IS FURTHER DECIDED that, as stipulated by the parties, neither party is entitled to costs and disbursements under TCR-MD 19 with respect to Plaintiff's appeal of property identified as Account R165943.

IT IS FURTHER DECIDED that Defendant's request for costs and disbursements with respect to Plaintiff's appeal of property identified as Account R165942 is denied.

Dated this ____ day of July 2014.


_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by __mailing__ to: 1163 State Street, Salem, OR 97301-2563; or by __hand delivery__ to: Fourth Floor, 1241 State Street, Salem, OR. Your Complaint must be submitted within __60__ days after the date of the Final Decision or this Final Decision cannot be changed.*
*This Final Decision was signed by Magistrate Allison R. Boomer on July 3, 2014. The Court filed and entered this Final Decision on July 3, 2014.*